**FEDERAL KEMPER LIFE ASSURANCE COMPANY, an Illinois corporation, Plaintiff/Counter–Claimant–Defendant–Appellee,**

v.

**Verlie J. ELLIS, Defendant/Counter–Claimant–Appellant.**

No. 92–3392.

United States Court of Appeals,
Tenth Circuit.

June 30, 1994.

Anne L. Baker (Thomas E. Wright, also of Davis, Wright, Unrein, Hummer & McCallister, with her on the briefs), Topeka, KS, for Verlie J. Ellis.

Frederick K. Starrett (William G. Howard, also of Lathrop & Norquist, Overland Park,

KS, and C. David Barrier of Lathrop & Norquist, Kansas City, MO, with him on the brief), for Federal Kemper Life Assur. Co.

Steven L. Imber, Sp. Asst. Atty. Gen., and Roy T. Artman, Staff Atty., Kansas Ins. Dept., Topeka, KS, filed an amicus curiae brief on behalf of Ron Todd, Commissioner of Insurance of the State of Kansas.

Before LOGAN and BRORBY, Circuit Judges, and SEAY, Chief District Judge.*

LOGAN, Circuit Judge.

Defendant Verlie J. Ellis appeals the entry of summary judgment in favor of plaintiff Federal Kemper Life Assurance Company (Kemper) on Kemper's suit seeking a declaratory judgment that it did not owe the face amount of a policy insuring the life of defendant's decedent, Jerry Ellis, because the policy lapsed due to nonpayment of premiums. Defendant's counterclaim for the face amount of the policy, alleging Kemper's failure to send premium notices and a lapse notice, was dismissed.

The issues on appeal concern the district court's findings and conclusions that (1) the contract of insurance between Kemper and defendant required only one premium due notice be sent to defendant each quarter; (2) Kemper met this obligation when it deposited in the mail one premium due notice to defendant at her last known address; and (3) Kemper was not estopped from denying coverage because it fulfilled its contractual obligation by mailing the premium due notice to defendant, despite the apparent misaddressing of the second premium due and lapse notices. Defendant also objects on appeal to the magistrate judge's order of April 22, 1992, denying her motion to amend the answer and counterclaim to add tort claims against Kemper.[1]

## I

Defendant and her husband, Jerry L. Ellis (the decedent), were the sole owners of Network Interface Corporation (a/k/a Network Innovations Corporation) (NIC). On July 16, 1987, Kemper issued four life insurance policies to NIC as owner and beneficiary. Two of these policies insured the life of Jerry Ellis, one the life of defendant, and one the life of Douglas H. Steen, director of systems for NIC. In August 1987, the policy that is the subject of this declaratory judgment action was amended to name defendant as its beneficiary and owner. This policy was a $500,000 increasing premium term whole life policy with no cash value until the sixteenth anniversary.[2]

From the date of issuance until late April 1988, NIC paid the premiums on the policies through preauthorized bank drafts. In April 1988, the bank returned to Kemper the draft on the policy on the life of Steen. Kemper then notified NIC, defendant, and the decedent that preauthorized payment would no longer be available on any of the four policies, and that premiums would be billed on a quarterly basis.[3] Kemper's letter stated in part:

As this draft has been returned, we have discontinued drafting your checking account and have reversed this premium from your policy.

We will need a remittance of $688.71 prior to 4–29–88 in order to begin billing you on a direct quarterly basis. Currently, your policy is paid to 3–16–88. Please note that if the premium remains unpaid 31 days after the due date, your policy will lapse.

---

* The Honorable Frank H. Seay, Chief Judge, United States District Court for the Eastern District of Oklahoma, sitting by designation.

1. Defendant also moved to add a new counterclaim defendant, T.J. Associates, and for a jury trial. However, in her reply brief defendant states she is not appealing the denial of her motion to add T.J. Associates as a party. Our disposition of the other issues renders moot the denial of the jury trial demand.

2. The applications for each of the four policies were taken by Lorne R. Miller, a salesman and agent of New England Financial Services, Inc. T.J. Associates served as the insurance broker and general agent of Kemper on the four policies issued through Miller to defendant and/or NIC.

3. There is some disagreement whether the draft was dishonored as to all of the policies or only as to the Steen policy. In any event it was at this point that NIC began paying the remaining three policy premiums on a quarterly basis.

I Appellee App. 194. Defendant, in her capacity as vice president of NIC, responded to Kemper's notice in a letter dated April 25, 1988. Defendant explained that nonpayment of the preauthorized draft reflected NIC's decision to cancel Steen's policy and asked Kemper to adjust the premium and confirm billing in direct quarterly payments on the other three policies.

From April 1988 through April 1990, Kemper mailed (from its home offices in Longrove, Illinois) separate quarterly premium due notices for each of the three policies. The notices were sent to the NIC business address of 15019 West 95th Street, Lenexa, Kansas, 66215. The premium due notice on the policy at issue was addressed to defendant and the other two policy due notices were addressed to NIC. The bookkeeper at NIC, Kathryn Gamble, was responsible for paying premiums on the life insurance policies beginning in May 1989. Timely payments were made on all three of the policies up to and including the premiums due January 16, 1990.

Each premium due notice stated on the front side "NOTICE OF LIFE INSURANCE PAYMENT DUE," the owner's name, the policy number, the premium due date, and the premium due amount. I Appellee App. 217–19. The reverse side of each premium due notice contained the following provisions:

### CONDITIONS

The sending of this notice shall not be held to waive any forfeiture or lapse of the policy caused by the failure to pay any previously due payment hereunder. Should this policy be restored at any time by acceptance of a premium after the same is due and payable, such restoration shall not create an obligation or precedent for waiving any condition of the policy in regard to payment of any subsequent premium on the date it becomes due.

Agents are not authorized to make contracts, grant permits, waive or alter any of the terms or conditions of the policy or receipt, waive forfeiture of the policy or waive any of the conditions herein, extend time for the payment of any premium, or make collections or bind the company for anything received, except upon receipts signed by the president, vice president, secretary or assistant secretary.

Any draft, check, or remittance other than cash tendered in payment of premium or interest will be accepted by the company for collection purposes only, and same shall not be binding until the company actually receives the cash thereof.

*Id.*

The policies each contained provisions relating to premium payment as follows:

### PREMIUM PAYMENT SECTION

**General** ... A premium paid is deemed fully earned on its due date....

**Frequency** Premiums are due in advance at the start of each billing period....

**Grace Period** A grace period of 31 days will be allowed for payment of each premium after the first.

This policy will continue in force during the grace period. If the insured dies during the grace period, the unpaid premium will be deducted from the proceeds.

**Reinstatement** Reinstatement means to restore this policy to a normal in force status after it has gone into default because a premium due was not paid before the end of a grace period.... We will reinstate this policy if we receive:

1 your request to do so: a prior to the Maturity Date and the death of the insured and b within five years after the due date of the unpaid premium;

2 due proof that the insured is insurable;

3 payment of all premiums which would have been due had this policy not gone into default;

4 payment of interest at 6% per year compounded annually on each premium which would have been due had this policy not gone into default; and

5 payment or restoration of a any indebtedness in effect as of the date this policy went into default, plus b interest on that indebtedness at 6% per year compounded annually.

A reinstatement will be effective only as of the date we approve your request for reinstatement.

*Id.* at 151.

From 1988, when NIC changed its mode of payment to direct quarterly billing, through January 1990, NIC paid every premium due on each of the policies following receipt of the first premium due notice from Kemper. Premium due notices identify a paid-to-date, *i.e.,* the last day the previously-paid premium covers. Kemper routinely mails a second notice of premium due if twenty days after the paid-to-date the first notice payment has not been received; then, a lapse notice thirty-one days after the paid-to-date.

At this point the parties' accounts of the facts diverge. Kemper asserts that on or about March 19, 1990, it sent quarterly premium due notices for all three policies to the 15019 West 95th Street address. Each premium was due (payable) on or before April 16, 1990. According to the terms of each policy, the thirty-day grace period commenced April 17, 1990. The parties agree that on April 23, 1990, NIC bookkeeper Gamble prepared and signed a check paying premiums on two of the policies. However, no check was prepared for payment of the quarterly premium for the policy at issue in this lawsuit. Defendant asserts that no premium due notice was received for that policy, based on her deposition statement that the notice did not cross her desk, and Gamble's deposition statement that if she had seen an invoice pertaining to the policy she would have paid it. Gamble stated that neither the premium due notice, the past due notice, nor a lapse notice on the policy came to NIC. However, Kemper points out that Gamble stated that she did not know whether the premium due notice might have been misrouted at NIC. Essentially then, Kemper asserted it mailed the premium due notice to defendant for the policy at issue, but defendant contends that the notice never arrived.

Kemper did not receive payment for the quarterly premium for the policy at issue by April 16, 1990, and asserts it then mailed out a second, or reminder notice, approximately twenty days after the paid-to-date. However, between March 19, when the first notice allegedly was mailed, and May 7, when Kemper contends it prepared a twenty-day overdue notice, the mailing address for the policy at issue had been changed on Kemper's records to 12603 Overbrook, Leawood, Kansas, 66203. Defendant claims she never had any association with the Leawood address, and has no idea where that mailing address came from. Kemper's records show that the address was changed, but not who requested the change. No written correspondence concerning the change was produced during discovery.[4]

Under the contract of insurance, when the payment due on April 16 went unpaid, the grace period for the policy at issue here expired May 17, 1990. On January 15, 1991, Jerry L. Ellis, the insured, died. Agent Lorne Miller called Kemper a few days after Ellis' death and was informed that the policy had lapsed because no premium payments were made after January 1990. On February 11, 1991, NIC requested that the policy be reinstated, and tendered a check to Kemper for the unpaid premiums. On February 19, 1991, Miller submitted to Kemper claims on both policies on the decedent's life. Kemper paid (to NIC) the insurance proceeds and interest due under the policy on which premiums had been paid but denied defendant's claim for payment of the proceeds under the policy at issue, asserting it had lapsed on April 16, 1990, for nonpayment of premiums.

On July 12, 1991, Kemper filed its complaint seeking a declaratory judgment. Defendant filed an answer and counterclaim alleging Kemper was obligated to pay the face amount of the policy because the nonpayment of premiums resulted from Kemper's breach of its contractual obligations to properly send premium due notices and lapse of policy notice. On December 9, 1991, de-

4. There was considerable evidence presented concerning how the address might have been changed at Kemper's place of business, but none of the evidence was conclusive. A lapse notice was also sent to the 12603 Overbrook address, and returned to Kemper with a forwarding order expired notation. Defendant contends she did not receive either the first notice, the second notice, or the lapse notice.

fendant filed her separate demand for a jury trial; Kemper timely filed its opposition to the demand arguing, inter alia, it was untimely. The district court denied defendant's request for a jury trial. Defendant then filed a motion for leave to file an answer and amended counterclaim complaint, and again demanded a jury trial. Kemper opposed the motion on the basis that any attempt to amend was futile because none of the proposed amendments stated a cognizable claim under substantive law. The magistrate judge denied defendant's motion for leave to amend. The magistrate judge's memorandum and order was accepted and affirmed by the district court. After discovery was substantially complete, the district court granted Kemper's motion for summary judgment and denied defendant's counter-motion for summary judgment.

We review a grant of summary judgment de novo, applying the same legal standard used by the district court under Fed.R.Civ.P. 56(c). *Anaconda Minerals Co. v. Stoller Chem. Co.,* 990 F.2d 1175, 1177 n. 3 (10th Cir.1993). "Summary judgment is appropriate when there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Russillo v. Scarborough,* 935 F.2d 1167, 1170 (10th Cir. 1991). If the moving party meets its initial burden, the nonmoving party must then demonstrate a genuine issue for trial on a material fact. *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991).

## II

Defendant asserts that the district court erroneously construed the insurance policy as requiring only the mailing of one premium due notice. Construction of an insurance contract is a matter of law to be determined by the court; therefore, we review the district court's construction of the contract de novo. *See Scott v. Keever,* 212 Kan. 719, 512 P.2d 346, 349 (1973). "In construing an insurance contract, a court should consider the document as a whole and endeavor to ascertain the intentions of the parties from the language used, taking into account the situation of the parties, the nature of the subject matter, and the purpose

to be accomplished." *Wing Mah v. United States Fire Ins. Co.,* 218 Kan. 583, 545 P.2d 366, 369 (1976). If the terms of a policy are ambiguous or susceptible of more than one meaning, the meaning most favorable to the insured must prevail. *Id.*

The district court examined the policy and determined it was silent as to the giving of notice, providing only that failure to pay a premium would cause the insurance to lapse. The application for insurance, however, indicated that the applicant could be billed. *See American W. Life Ins. Co. v. Hooker,* 622 P.2d 775 (Utah 1980) (application found to be part of an insurance contract). The district court determined that reading the contract as a whole one could reach contrary conclusions as to whether Kemper was required to send a premium due notice for each billing period; thus the policy was ambiguous. The district court memorandum and order stated that "the ambiguous language of the contract lends itself to a finding that a reasonable insured would expect such notice to be sent." III Appellant App. 708. It noted further that Kemper sent notices to defendant each quarter once NIC began paying the premiums directly, and that this conduct would have caused a reasonable insured to expect a premium due notice. *Id.* The district court concluded the policy required Kemper to mail one notice of premium due each quarter.

Defendant contends that the contract required Kemper to send at least a second, and perhaps a third notice. Defendant bases this argument on evidence that Kemper's practice was to send a premium due notice, a second notice, and finally a notice that the policy was about to lapse. Although neither the contract or the application for insurance supports this assertion, defendant points out that in interpreting an ambiguous contract we may consider the conduct of a party, *see Heyen v. Hartnett,* 235 Kan. 117, 679 P.2d 1152, 1157 (1984); defendant contends that Kemper's practice of sending two premium due notices and one lapse notice before treating a policy as forfeited for nonpayment is evidence of Kemper's interpretation of the contract. We note, nevertheless, that defendant could not have relied upon this practice because the record indicates defendant never

received more than one notice of each premium.

■ Defendant strenuously argues that by requiring Kemper to mail only one premium notice, the district court put responsibility for continuity of coverage solely upon the policy owner.[5] But it does not seem unreasonable to expect owners of insurance who pay premiums quarterly to notice when they have not paid a premium; the policy itself emphasizes that premiums are due in advance and advises of only a thirty-one-day grace period. Further, Kansas statutory law protects insureds for six months from cancellation of a life insurance policy unless the insurance carrier mails a termination notice of intent to cancel the policy.[6] In the absence of contractual protections beyond that provided by the state legislature, we hold that the district court correctly found the contract required only that plaintiff mail one notice of premium due for each quarterly payment.[7]

### III

■ Defendant next contends that a genuine issue of material fact exists whether the March 1990 notice was mailed in compliance with the contract. Kemper had no duty to ensure defendant actually received the notice, but only to mail the notice to the defendant's address. *See, e.g., Feldt v. Union Ins. Co.,* 240 Kan. 108, 726 P.2d 1341, 1343 (1986) (interpreting automobile liability insurance

---

5. Defendant also argues that consumer expectations are that they will receive more than one mailing.

6. Kan.Stat.Ann. §§ 40–410 and 40–411 provide protection for insureds who fail to receive notice as required by the statutes.

**40–410. Cancellation of policy for nonpayment of premiums; notice, when; policyowner defined.** It shall be unlawful for any life insurance company ... doing business in this state within six (6) months after default in payment of any premium or installment of premium, to forfeit or cancel any life insurance policy on account of nonpayment of any such premium or installment of premium thereon, without first giving notice in writing to the policyowner of such policy of its intention to forfeit or cancel the same: *Provided, however,* That this section shall not apply to any policy under the terms of which the premium is to be paid weekly, biweekly or monthly and under which a grace period of at least four (4) weeks is granted for the payment of every premium after the first, during which time the insurance shall continue in force....

**40–411. Notice of intention to cancel policy for non-payment of premiums; time for payment.** Before any such cancellation or forfeiture can be made for the non-payment of any such premium the insurance company shall notify the policyowner of any such policy that the premium thereon, stating the amount thereof, is due and unpaid, and of its intention to forfeit or cancel the same, and such policyowner shall have the right, at any time within thirty (30) days after such notice has been duly deposited in the post office, postage prepaid, and addressed to such policyowner to the address last known by such company, to pay such premium: *Provided,* That in lieu of the notice hereinbefore provided, in the case of policies providing for a period of grace of not less than thirty (30) days, or one month, for the payment of premiums and containing any provision for cancellation or forfeiture in case of nonpayment of premiums at the end of such period, the insurance company may, not more than thirty (30) days prior to the date specified in such policy when any premium will become due and payable without grace, in like manner notify the policyowner under any such policy, of the date when such premium will fall due, stating the amount thereof, and its intention to forfeit or cancel the same if such premium be not paid within the period of grace provided in the policy; and any attempt on the part of such insurance company, within six (6) months after default in the payment of any premium, to cancel or forfeit any such policy without the notice herein provided shall be null and void. The affidavit of any responsible officer, clerk or agent of the corporation authorized to mail such notice, that the notice required by this section has been duly addressed and mailed by the corporation issuing such policy shall be prima facie evidence that such notice has been duly given.

Thus Kansas law prevents insurance companies from cancelling or forfeiting policies such as the one at issue before six months from the date of default without giving proper notice. Policies providing that they have no efficacy after default are not affected beyond the statutory six-month period. *See Miner v. Standard Life and Accident Ins. Co.,* 451 F.2d 1273, 1275 (10th Cir.1971).

7. The district court also stated "that even if the policy was construed to require actual receipt of the notice plaintiff did not breach the contract at issue." III Appellant App. 710. The court then discussed a presumption of receipt, and determined that defendant had failed to actually allege nonreceipt. We do not reach this alternative ruling of the court because we hold that the court's primary interpretation of the contract, that the notice be mailed, is correct.

statute that requires only mailing of notice); *Bell v. Patrons Mut. Ins. Ass'n,* 15 Kan. App.2d 791, 816 P.2d 407, 408–09 (1991) (where policy provided that it could be cancelled by mailing notice to the named insured, court found that proof of mailing was sufficient; contract unambiguously required only mailing). Thus, the district court need only have determined if there was a material issue of fact whether the notice was *mailed.*

Proof of customary and usual computer procedures is sufficient to show adherence to usual and customary procedures of proper mailing. *Gulf Coast Inv. Corp. v. Secretary of HUD,* 509 F.Supp. 1321, 1325–26 (E.D.La.1980); *see also Board of County Comm'rs of Johnson County v. Coleman American Properties, Inc. (In re American Properties, Inc.),* 30 B.R. 235, 237 (Bankr. D.Kan.1983); Fed.R.Evid. 406. Kemper provided materials establishing a standard operating procedure regarding the sending of premium due notices. Kemper provided evidence that notices and accompanying envelopes are generated one month prior to the due date of the premium; and that the notices are hand carried to the mail room, inserted into envelopes, and deposited in the mail within forty-eight hours. Plaintiff supplied a copy of a status report showing a premium due notice for the policy at issue was generated and mailed to defendant on March 19, 1990.

Defendant argues that the testimony she presented that neither she nor her bookkeeper ever received the notice in question rebuts the presumption that the notice was mailed and thus creates an issue of material fact. We disagree. The contract required only that a notice be mailed. The burden of the failure of the post office to deliver falls upon the insured, not the insurer, in such circumstances. Simple denial of receipt does not create an issue for the jury as to whether the notice was mailed when Kemper has presented evidence of standard mailing procedures. The cases defendant cites in support of her argument all deal with presumption of *receipt* upon a showing of mailing. *See, e.g., In re American Properties, Inc.,* 30 B.R. 247 at 250; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dodd (In re Dodd),* 82 B.R. 924, 928 (Bankr.N.D.Ill.1987); *Miller v. Kansas City Chamber of Commerce,* 141 Kan. 459, 41 P.2d 715 (1935). Defendant's testimony that she did not receive the notice would create a jury issue on receipt. But we have agreed with the district court that the policy required mailing only. Therefore we must uphold the district court's determination that there was no material issue of fact established by defendant's evidence.

IV

Defendant also asserts that Kemper is estopped from denying coverage based on nonpayment of premiums because of its own misconduct in failing to properly mail the second premium due notice and the lapse notice. In ruling on this issue, the district court stated:

> Defendant's estoppel argument is premised upon an assumption that she was entitled to receive all three notices under the contract. Because plaintiff mishandled the second and third notices, defendant contends that [plaintiff] should be estopped from denying coverage for nonpayment of premiums. The court disagrees. Construing the contract liberally, as the court has, all that can be said to have been owed to defendant was the sending of one notice of premium due. It is uncontroverted that plaintiff sent one notice to the proper address. Defendant has not rebutted the presumption of receipt of the notice[8] nor

8. In ruling on this issue the district court acknowledged that when mail is properly addressed, stamped and deposited in the mail system there is a strong although rebuttable presumption that it was received by the party to whom it was sent, citing, inter alia, *Hagner v. United States,* 285 U.S. 427, 430, 52 S.Ct. 417, 418–19, 76 L.Ed. 861 (1932); *Beck v. Somerset Technologies, Inc.,* 882 F.2d 993, 996 (5th Cir. 1989). The district court stated that "[d]enial of receipt does not, as a matter of law rebut the presumption, but rather creates a question of fact." III Appellant App. 710 (citing *Swink & Co. v. Carroll McEntee and McGinley, Inc.,* 266 Ark. 279, 584 S.W.2d 393 (1979)). We believe the district court confused the presumption of receipt when mailing is shown with a presumption that the mailing was made based on proof of custom of standard office procedure.

raised a question of fact as to the propriety of the sending of that notice. Because plaintiff did all that was required of it under the contract, defendant's estoppel argument based on her contention that she was entitled to receive three notices must fail.

III Appellant App. 711–12.

We have already determined that no genuine issue of material fact existed whether Kemper met its duty to send one notice. However, defendant argues that based on Kemper's business practices a second and then a lapse notice should have been mailed to her correct address. She argues that because she did not receive these notices she did not pay the premiums, and that the company is now estopped from forfeiting the insurance contract because of its usual practice of sending notices.

■■■■ As cited by defendant herself, the rules for asserting equitable estoppel under Kansas law are as follows:

> Equitable estoppel is the effect of the voluntary conduct of a person whereby he is precluded, both at law and in equity, from asserting rights against another person *relying* on such conduct. A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must show it rightfully *relied* and *acted* upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts.

*Lines v. City of Topeka*, 223 Kan. 772, 577 P.2d 42 (1978) (emphasis added) (quoting *United Am. State Bank & Trust Co. v. Wild West Chrysler Plymouth, Inc.*, 221 Kan. 523, 561 P.2d 792, 795 (1977). The problem with her argument is that defendant cannot show actual reliance on Kemper's conduct or representation. Defendant has not shown that she ever received a second or a lapse notice, or that the policy provided she would receive such a second or lapse notice. Therefore, even under the facts alleged by defendant she has failed to set out a claim of estoppel. The issues surrounding the Leawood address evidently used by Kemper when mailing the second and lapse notices are surplusage.

## V

■■■ Finally, defendant argues that she should have been granted leave to amend her counterclaim complaint to add a negligence claim.[9] The magistrate judge's order denying that motion stated that "[t]he allegations of negligence in substance add no new claims. They accomplish nothing more than to say that the plaintiff negligently breached the insurance contract. Defendant may show such negligence in proving the breaches alleged under Counts I and II." I Appellant App. 131. We review denial of a motion to file an amended counterclaim complaint for abuse of discretion, *Travelers Indem. Co. v. United States*, 382 F.2d 103 (10th Cir.1967), unless the denial is based on an erroneous rule of law, which we review de novo. *See Banks v. Wolk*, 918 F.2d 418, 419 (3d Cir. 1990).

■■■ Defendant asserts that Kemper owed defendant a high duty of care in its office procedures and practices independent of its contractual duties.[10] We agree with

---

9. Defendant does not appeal denial of leave to amend by adding T.J. & Associates as a party "because [plaintiff] now concedes that T.J. & Associates was acting as its agent." Appellant's Reply Brief at 12, n. 4.

10. Defendant cites in support of this independent tort duty *Nature's Share, Inc. v. Kutter Products, Inc.*, 752 F.Supp. 371, 384–86 (D.Kan.1990), in which the court found the defendant had a duty to warn or instruct the plaintiff about proper handling of the product that was the subject of a contract between the parties. The court characterized the duty as one imposed by law, breach of which would be a tort. *Id.* However, the court also distinguished between tort duties arising from service contracts, *see Malone v. University of Kansas Medical Center*, 220 Kan. 371, 552 P.2d 885 (1976); *Atkinson v. Orkin Exterminating Co.*, 5 Kan.App.2d 739, 625 P.2d 505 (Kan.App.), *aff'd*, 230 Kan. 277, 634 P.2d 1071 (1981), and contractual duties, *see Ford Motor Credit Co. v. Suburban Ford*, 237 Kan. 195, 699 P.2d 992, *cert. denied*, 474 U.S. 995, 106 S.Ct. 409, 88 L.Ed.2d 360 (1985). "The difference between a tort and contract action is that a breach of contract is a failure of performance of a duty arising under or imposed by agreement; whereas, a tort is a violation of a duty imposed by law." *Guarantee Abstract v. Interstate Fire & Casualty*, 232 Kan. 76, 652 P.2d 665, 667 (1982) (citing *Atkinson* ).

the magistrate judge's reasoning that defendant's argument that Kemper was negligent adds nothing to her breach of contract claims; the proposed tort claims "merely say that the conduct of plaintiff by which it breached the contracts was negligent," Attachments to Appellant's Brief at 130, and sought the same amount of damages (the policy amount) as the contract claims. *See Osgood v. State Farm Mut. Auto. Ins. Co.,* 848 F.2d 141, 145 (10th Cir.1988) (Kansas law requires additional injury beyond contract damages to assert independent tort claim for punitive damages).

The district court did not abuse its discretion in denying leave to amend.

AFFIRMED.